1

Lesley E. Weaver (State Bar No. 191305)
**Block & Leviton LLP**
492 9th Street, Suite 260
Oakland, CA 94607
Telephone: (415) 968-8999
Facsimile: (617) 507-6020
lweaver@blockesq.com

2

3

4

5

*Counsel for Flextronics International USA, Inc.*

6

7

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

8

9

| | |
|---|---|
| **FLEXTRONICS INTERNATIONAL USA, INC.**<br><br> **Plaintiff,**<br><br>v.<br><br>**NEC TOKIN Corporation; NEC TOKIN America, Inc.; KEMET Corporation; KEMET Electronics Corporation; Nippon Chemi-Con Corporation; Hitachi Chemical Co., Ltd.; Hitachi AIC Inc.; Hitachi Chemical Co. America, Ltd.; Nichicon Corporation; FPCAP Electronics (Suzhou) Co., Ltd.; AVX Corporation; Rubycon Corporation; Rubycon America Inc.; ELNA Co., Ltd.; ELNA America Inc.; Matsuo Electric Co., Ltd.; TOSHIN KOGYO Co., Ltd.; Holy Stone Enterprise Co., Ltd.; HolyStone International; ROHM Co., Ltd.; EPCOS AG; Okaya Electric Industries Co., Ltd.; Taitsu Corporation; Taitsu America, Inc.; Shinyei Kaisha; Nitsuko Electronics Corporation; Nissei Electric Co., Ltd.; and Soshin Electric Co., Ltd.**<br><br> **Defendants.** | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

BACKGROUND AND OVERVIEW………....................................................................1

JURISDICTION AND VENUE …………......................................................... ………5

PARTIES - Plaintiff ………….…………....................................................................... 6

PARTIES - Defendants ………………..…................................................. ……….7

PARTIES – Co-Conspirators and Agents ……………….......................................……….20

TRADE AND COMMERCE …………….…....................................................... ………21

FACTUAL ALLEGATIONS ……………….…….................................... ……….24

    I.    OVERVIEW OF CAPACITOR FUNCTIONALITY.................................... 24

    II.  TYPES OF CAPACITORS.…................................................................... 25

           A.  Electrolytic Capacitors….................................................... 26
              1.      Aluminum Capacitors ................................................ 26
              2.      Tantalum Capacitors ................................................ 28
           B.  Film Capacitors………….......................................................... 29

    III. THE CAPACITOR CARTEL .................................................................... 30

           A.  Overview of the Cartel's Activities…................................................. 30
           B.  Industry-Wide Conspiratorial Activities and Communications ............................ 32
           C.  Agreements and Communications Among Sub-Groups of the Conspirators ....... 42
           D.  The Conspiracy's Effect on United States Commerce........................................... 44

    IV. CHARACTERISTICS OF THE CAPACITORS MARKET
         FACILITATE COLLUSION ........................................................................ 46

           A.  Market Concentration……….......................................................... 46
           B.  Barriers to Entry……….......................................................... 47
           C.  Mutual Interchangeability of Defendants' Capacitors…… ........................ 50
           D.  Inelastic Demand…….......................................................... 51
           E.  Commoditization…….......................................................... 52
           F.  Weak Demand…….. …….......................................................... 52
           G.  Excess Manufacturing Capacity…….......................................................... 53
           H.  Ease of Information Sharing Among Defendants…… ........................ 53

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

V. U.S. AND INTERNATIONAL ANTITRUST INVESTIGATIONS
INTO THE CAPACITORS INDUSTRY.. ....................................................... 55

VI. FRAUDULENT CONCEALMENT ............................................................ 56

VII. EFFECTS OF DEFENDANTS' CONSPIRACY ........................................... 59

FIRST CLAIM FOR RELIEF (Alleged Against All Defendants)
RESTRAINT OF TRADE IN VIOLATION OF THE SHERMAN ACT §1 15 U.S.C. §1 ......... 60

SECOND CLAIM FOR RELIEF (Alleged Against All Defendants)
VIOLATION OF STATE ANTITRUST AND UNFAIR COMPETITION LAW
(Bus. & Prof. Code, sections 16720 *et seq.* and section 17200 *et seq.*) ........................................ 62

DEMAND FOR JUDGMENT……. …........................................................... 67

JURY DEMAND ................................................................................... 68

ii

Plaintiff Flextronics International USA, Inc., on behalf of itself and its parent, subsidiaries, affiliates, and related entities (collectively, "Flextronics" or "Plaintiff"), brings this action for damages under the antitrust laws of the United States and the State of California against NEC TOKIN Corporation; NEC TOKIN America, Inc.; KEMET Corporation; KEMET Electronics Corporation; Nippon Chemi-Con Corporation; Hitachi Chemical Co., Ltd.; Hitachi AIC Inc.; Hitachi Chemical Co. America, Ltd.; Nichicon Corporation; FPCAP Electronics (Suzhou) Co., Ltd.; AVX Corporation; Rubycon Corporation; Rubycon America Inc.; ELNA Co., Ltd.; ELNA America Inc.; Matsuo Electric Co., Ltd.; TOSHIN KOGYO Co., Ltd.; Holy Stone Enterprise Co., Ltd.; HolyStone International; ROHM Co., Ltd.; EPCOS AG; Okaya Electric Industries Co., Ltd.; Taitsu Corporation; Taitsu America, Inc.; Shinyei Kaisha; Nitsuko Electronics Corporation; Nissei Electric Co., Ltd.; Soshin Electric Co., Ltd. (collectively, "Defendants"). The allegations set forth below are based on the investigation of its counsel, personal knowledge, and information and belief.

## BACKGROUND AND OVERVIEW

1.      Flextronics seeks damages arising from an unlawful conspiracy (the "Conspiracy") in restraint of trade in the market for electrolytic and film capacitors (together, "Capacitors") that was orchestrated by the Defendants and other known and unknown conspirators (collectively, the "Conspirators") between no later than January 1, 2003 and no earlier than June 1, 2014 (the "Conspiracy Period").

2.      Flextronics International, USA, Inc. is a global leader in design, manufacturing, distribution and aftermarket services.  Its headquarters and primary place of business is located in San Jose, California.

3.      Flextronics owns and maintains a global network of manufacturing facilities in the United States and abroad.  These facilities manufacture a broad array of products

sold for consumer, medical, automotive, aerospace, and defense applications, among others.  Many of these products are electrical or electronic.  Products manufactured by Flextronics are sold around the world, including to United States companies and to United States end-users.

4.     Capacitors are fundamental components of most of the electrical and electronic products manufactured by Flextronics.  As a result, Flextronics directly purchased (at least) hundreds of millions of dollars of Capacitors from the Conspirators during the Conspiracy Period.  Many of these Capacitors were either imported into the United States and used at United States manufacturing facilities, purchased for use in the manufacture of products for United States customers or assembled into products sold to United States corporations or end-users.

5.     Electronics and electrical product companies, including many located in the United States, rely on manufacturers such as Flextronics to manufacture devices that include electronic and electrical components.

6.     Flextronics typically directly purchases the electric and electronic components, including Capacitors, necessary to manufacture products for Flextronics's customers. Flextronics then uses its global manufacturing, supply chain, and logistical expertise to manufacture and deliver products to Flextronics's customers worldwide, including businesses and end-users in the United States.

7.     Throughout the Conspiracy Period, the Conspirators and sub-groups of the Conspirators reached unlawful agreements that artificially inflated the price of Capacitors sold directly and indirectly to Flextronics.   Some of these agreements targeted the

FLEXTRONICS INTERNATIONAL USA, INC.'S COMPLAINT

Capacitor market generally, other agreements specifically targeted Flextronics, and still other agreements targeted Flextronics's customers.

8.     The targets of the Conspiracy included many Flextronics customers located in the United States and many products manufactured by Flextronics that were intended to be sold to United States businesses and end-users.  The Conspiracy thus directly, foreseeably, and substantially affected United States commerce.

9.     The Conspiracy also involved import commerce because the conspiratorial agreements targeted Capacitors imported into the United States or Capacitors that were components of products sold to United States businesses and end-users.

10.     Both the overall Conspiracy alleged herein and the specific conspiracies targeting United States companies (such as Dell or Apple), targeting companies producing goods for United States businesses (such as HP or Acer), and targeting Capacitors that were manufactured as components for inclusion in products sold to United States end-users give rise to antitrust and other claims by Flextronics.

11.     The Conspiracy was furthered and facilitated by a course of anticompetitive conduct and overt acts, including numerous unlawful agreements (both written and oral) relating to the price of Capacitors.  These agreements and understandings were developed during regular monthly, annual, and bi-annual meetings, as well as *ad hoc* meetings between the Conspirators and subsets of certain Conspirators.

12.     The Conspirators also agreed to restrain their respective Capacitor manufacturing outputs in order to artificially inflate Capacitor prices.

13.     In furtherance of their conspiracy, the Conspirators exchanged highly confidential and commercially-sensitive information relating to Flextronics and its

customers.   Many of these exchanges violated specific contractual agreements with Flextronics.

14.     The Conspirators routinely shared current and future Capacitors pricing intentions, timing of pricing changes, production capacity, costs, availability and cost of raw materials, product distribution, and other data that the Conspirators used to assist to implement and police the conspiracy.   Flextronics and its customers were the specific targets of many of these anticompetitive activities.

15.     The Conspirators concealed their anticompetitive and unlawful conduct from the public and their customers, including Flextronics, from the inception of the conspiracy until 2014.

16.     The conspiracy alleged herein inflated the price of Capacitors sold directly and indirectly to Flextronics.

17.     The Conspirators' anticompetitive and unlawful conduct directly caused the increase and/or slowed the decrease of prices for Capacitors sold to Flextronics.

18.     As a result, Flextronics paid artificially-inflated prices for Capacitors. By paying higher prices for Capacitors than those that would have prevailed in a competitive market, Flextronics has been injured in its business and property as a direct and proximate result of the Conspirators' actions.

19.     Co-conspirator Panasonic Corporation, on behalf of itself and its wholly-owned subsidiaries (Panasonic Corporation of North America, SANYO Electric Co., Ltd., and SANYO North America Corporation), has admitted to the United States Department of Justice ("DOJ") that Panasonic engaged in price fixing activities with other Conspirators beginning no later than January 1, 2003.

# JURISDICTION AND VENUE

20.    Flextronics brings this action to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees, arising from the Conspirators' violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and California law.

21.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26). This Court has supplemental jurisdiction over the California state law claims pursuant to 28 U.S.C. § 1367, because the California state law claims arise from the same case or controversy as the federal claims alleged herein.

22.    Jurisdiction and venue are proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District, is licensed to do business in this District, and/or transacts business in this District.

23.    Pursuant to Civil Local Rule 3.2 (c) and (e), assignment of this case to the San Francisco Division of the United States District Court for the Northern District of California is proper because the interstate trade and commerce involved and affected by Defendants' violations of the antitrust laws action was substantially conducted within, directed toward or impacted Plaintiff in a county located within the Division.

## PARTIES

### Plaintiff

24.     Flextronics International USA, Inc. is a California corporation that maintains its principal place of business at 6201 America Center Drive, San Jose, California 95002.   Flextronics manufactures electronic products and other goods at locations around the world, including in the United States.

25.     Flextronics directly purchases Capacitors for the purpose of manufacturing electronics for United States-based customers and for use by United States end-users.

26.      Flextronics's global Capacitor purchasing is managed and overseen by management located in San Jose, California.   All Flextronics purchases of Capacitors worldwide are made in United States dollars.

27.     Flextronics directly purchased Capacitors from Defendants NEC TOKIN Corporation and/or NEC TOKIN America, Inc.; KEMET Corporation and/or KEMET Electronics Corporation; Nippon Chemi-Con Corporation; Hitachi Chemical Co., Ltd. and/or Hitachi AIC Inc. and/or Hitachi Chemical Co. America, Ltd.; Nichicon Corporation; AVX Corporation; Rubycon Corporation and/or Rubycon America Inc.; ELNA Co., Ltd. and/or  ELNA America Inc.; Matsuo Electric Co., Ltd.; ROHM Co., Ltd.; EPCOS AG; Nitsuko Electronics Corporation; and Nissei Electric Co., Ltd., as well as many of the named Co-Conspirators identified herein, during the Conspiracy Period. Flextronics has directly suffered injury as a result of Defendants' anticompetitive and unlawful conduct.

**Defendants**

**NEC TOKIN Defendants**

28.     Defendant NEC TOKIN Corporation ("NEC TOKIN"), a Japanese company currently partially owned by both Defendant KEMET Electronics Corporation and non-party NEC Corporation, has its principal place of business located at 7-1, Kohriyama 6-chome, Taihaku-ku, Sendai-shi, Miyagi 982-8510, Japan. During the Conspiracy Period, NEC TOKIN manufactured, sold, and distributed electrolytic Capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

29.     Defendant NEC TOKIN America, Inc. ("NEC TOKIN America"), a California corporation, is a wholly-owned subsidiary of NEC TOKIN with its principal place of business located at 2460 North First Street, Suite 220, San Jose, California 95131. During the Conspiracy Period, NEC TOKIN America—either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers electrolytic Capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, NEC TOKIN.

30.     Defendants NEC TOKIN and NEC TOKIN America are together referred to herein as the "NEC TOKIN Defendants."

**KEMET Defendants**

31.     Defendant KEMET Corporation ("KEMET") is a Delaware corporation with its principal place of business located at 2835 Kemet Way, Simpsonville, South Carolina 29681. During the Conspiracy Period, KEMET manufactured, sold and

distributed electrolytic and/or film Capacitors either directly or through its business units, subsidiaries, agents or affiliates, to United States purchasers.

32.     Defendant KEMET Electronics Corporation ("KEC"), a Delaware corporation, is a wholly-owned subsidiary of KEMET with its principal place of business located at 2835 Kemet Way, Simpsonville, South Carolina 29681. During the Conspiracy Period, KEC—either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers electrolytic and/or film Capacitors manufactured by its own business units, subsidiaries, agents or affiliates, or those of its corporate parent, KEMET.

33.     On or about March 12, 2012, KEC publicly announced that it had entered into a Stock Purchase Agreement with NEC TOKIN and non-party NEC Corporation in which it agreed to purchase a 34% economic interest in NEC TOKIN (the remainder being held by NEC Corporation) that affords KEC a 51% voting interest in the company, and thus the right to appoint four of the seven members on NEC TOKIN's board of directors. KEC also entered into an Option Agreement with NEC TOKIN and NEC Corporation that provided KEC with two call options that, if exercised, would allow it to purchase all of NEC Corporation's economic interests and voting rights in NEC TOKIN, thereby effecting KEC's complete acquisition of NEC TOKIN.

34.     KEC's interest in NEC TOKIN provided KEC the opportunity to sell NEC TOKIN Capacitors, among other things, directly to United States purchasers. For example, KEC was able to ship NEC TOKIN-manufactured tantalum Capacitors directly from NEC TOKIN factories, and these Capacitors were sold using KEMET part numbers, labeled with KEMET labels, and invoiced through KEMET. By January 2014, KEC

8

publicly announced that it had "completed the integration of advanced components from NEC TOKIN" into its sales structure, thereby giving KEC the ability to sell NEC TOKIN's electrolytic Capacitors directly to KEC's customers.

35.     Accordingly, in addition to selling to United States purchasers KEC's own electrolytic and/or film Capacitors manufactured by certain of its own business units, subsidiaries, agents or affiliates or those of its corporate parent, KEMET, KEC has, since early 2012, sold and distributed NEC TOKIN's electrolytic Capacitors, directly or through its business units, subsidiaries, agents or affiliates, to United States purchasers.

36.     Having acquired and maintained a controlling majority voting interest in NEC TOKIN, KEMET has, since at least March 2012, had the authority to manage and operate NEC TOKIN, including but not limited to its corporate strategy and its Capacitor business. During the Conspiracy Period, KEMET became aware of the cartel and NEC TOKIN's participation in it. From 2012 to present, NEC TOKIN—while under KEMET's control—has continued to participate in the cartel's collusive actions to fix, raise, maintain, or stabilize prices for Capacitors. During this period, neither the managing officers or directors of KEMET nor the managing officers or directors of NEC TOKIN instructed or directed NEC TOKIN to withdraw from Defendants' price fixing cartel and the conspiracy. By acquiescing in NEC TOKIN's continued cartel activity, as well as failing to disclose or otherwise concealing NEC TOKIN's cartel activity, failing to cause NEC TOKIN to terminate its cartel activity and failing to cause NEC TOKIN to withdraw from the cartel, KEMET joined and actively participated in Defendants' conspiracy and committed overt acts in furtherance of the conspiracy.

9

37. Defendants KEMET and KEC are together referred to herein as the "KEMET Defendants."

## Nippon Chemi-Con

38. Defendant Nippon Chemi-Con Corporation ("Nippon Chemi-Con") is a Japanese corporation with its principal place of business located at 5-6-4, Osaki, Shinagawa-ku, Tokyo 141-8605, Japan. During the Conspiracy Period, Nippon Chemi-Con manufactured, sold, and distributed electrolytic and/or film Capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

## Hitachi Chemical Defendants

39. Defendant Hitachi Chemical Co., Ltd. ("Hitachi Chemical"), is a Japanese corporation with its principal place of business located at Grantokyo South Tower, 1-9-2, Marunouchi, Chiyoda-ku, Tokyo 100-6606, Japan. During the Conspiracy Period, Hitachi Chemical manufactured, sold, and distributed electrolytic and/or film Capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

40. Defendant Hitachi AIC Inc. ("Hitachi AIC"), a Japanese corporation, is a wholly-owned subsidiary of Hitachi Chemical with its principal place of business located at 1065, Kugeta, Moka-Shi Tochigi 321-4521, Japan. During the Conspiracy Period, Hitachi AIC—either directly or through its divisions, business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers electrolytic and/or film Capacitors manufactured by its own business units, subsidiaries, agents or affiliates, or those of its corporate parent, Hitachi Chemical.

FLEXTRONICS INTERNATIONAL USA, INC.'S COMPLAINT

41.     In or about December 2009, Hitachi AIC sold its tantalum and niobium Capacitors division to Defendant Holy Stone Enterprise Co., Ltd. The acquisition was completed by or about April 1, 2010, and the tantalum and niobium Capacitors division was renamed Holy Stone Polytech Co., Ltd., a Japanese corporation and wholly-owned subsidiary of Holy Stone Enterprise Co., Ltd. To the extent that any of the assets or liabilities of Hitachi AIC's tantalum and niobium Capacitors division remain in whole or in part with Hitachi AIC subsequent to the tantalum and niobium Capacitors division's sale to Holy Stone, Hitachi AIC is liable for any of this business division's violations of Sherman Act § 1 that occurred during the Conspiracy Period.

42.     Defendant Hitachi Chemical Co. America, Ltd. ("Hitachi Chemical America"), a New York corporation, is a wholly-owned subsidiary of Hitachi Chemical with its principal place of business located at 10080 North Wolfe Road, Suite SW3-200, Cupertino, California 95014. During the Conspiracy Period, Hitachi Chemical America— either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers electrolytic Capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, Hitachi Chemical (including, without limitation, Hitachi AIC).

43.     Defendants Hitachi Chemical, Hitachi AIC and Hitachi Chemical America are together referred to herein as the "Hitachi Chemical Defendants."

### Nichicon Defendants

44.     Defendant Nichicon Corporation ("Nichicon") is a Japanese corporation with its principal place of business located at Karasumadori Oike-agaru, Nakagyo-ku, Kyoto 604-0845, Japan. During the Conspiracy Period and until the company's sale of its

tantalum Capacitors division to Defendant AVX Corporation in or about February 2013, Nichicon manufactured, sold, and distributed tantalum Capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers. During the entire Conspiracy Period, Nichicon also manufactured, sold and distributed aluminum and/or film Capacitors, either directly or through its business units, subsidiaries, agents or affiliates, to United States purchasers. To the extent that the assets and liabilities of Nichicon's tantalum Capacitors division remain in whole or in part with Nichicon subsequent to the division's sale to AVX, Nichicon is liable the tantalum Capacitors division's violations of Sherman Act § 1 during the Conspiracy Period.

45.     Defendant FPCAP Electronics (Suzhou) Co., Ltd. ("FPCAP"), a Japanese corporation, is a wholly-owned subsidiary of Nichicon with its principal place of business located at 112 Sutong Road, Suzhou Industrial Park, Jiangsu, 215021, China. Having operated as FMD's conductive polymer aluminum solid electrolytic Capacitor business division (*i.e.*, FMD Suzhou) until in or about October 2008, FPCAP thereafter was acquired and renamed by Nichicon. From in or about October 2008 to date, FPCAP manufactured, sold and distributed aluminum Capacitors to United States purchasers, either directly or through its business units, subsidiaries, agents or affiliates, or those of its corporate parent, Nichicon.

46.     FCPAP is the successor-in-interest to all assets of FMD Suzhou, as well as the liabilities arising from FMD Suzhou's violations of Sherman Act § 1 that occurred during the Conspiracy Period. FPCAP is a mere continuation of FMD Suzhou as FPCAP was organized and operated during the period it was a business unit of FMD. The change of FMD Suzhou's ownership did not impact the continuity of its management, personnel,

physical locations, business, assets, and general business operations. Accordingly, FPCAP has assumed liability from FMD Suzhou and/or FMD for the cartel activity that originated at FMD Suzhou during the Conspiracy Period and has continued to date to be authorized and directed by FPCAP's officers, executives and employees following the acquisition.

47.     By acquiring FMD Suzhou, Nichicon has effectively purchased a participant in the unlawful cartel alleged herein and has thereby joined and participated in Defendants' conspiracy through FPCAP's acts taken in furtherance of the conspiracy.

48.     Defendants Nichicon and FPCAP are together referred to herein as the "Nichicon Defendants."

## AVX

49.     Defendant AVX Corporation ("AVX") is a Delaware corporation with its principal place of business located at One AVX Boulevard, Fountain Inn, South Carolina 29644. It is a subsidiary of non-party Kyocera Corporation, a Japanese corporation that owns approximately 72% of AVX's outstanding common stock. During the Conspiracy Period, AVX manufactured, sold, and distributed tantalum and/or film Capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

50.     In or about February 2013, AVX acquired Nichicon's tantalum Capacitor production facilities in Japan and China, thereby expanding AVX's global tantalum Capacitor manufacturing operations. Accordingly, after February 2013, AVX—either directly or through its business units, subsidiaries, agents or affiliates—manufactured, sold and distributed tantalum Capacitors produced by Nichicon's former tantalum electrolytic Capacitors division to United States purchasers.

13

51.     Having purchased Nichicon's former tantalum electrolytic Capacitors division, AVX is the successor-in-interest to all assets of this former Nichicon business unit, as well as the liabilities arising from its violations of Sherman Act § 1 during the Conspiracy Period. The business unit acquired by AVX from Nichicon is a mere continuation of the unit as it was organized and operated during the period it was a business unit of Nichicon. The change of ownership of this business unit did not impact the continuity of its management, personnel, physical locations, business, assets, and general business operations. Accordingly, AVX has assumed liability for the cartel activity that originated in this business unit during the Conspiracy Period while it was part of Nichicon and has continued to date to be authorized and directed by AVX's officers, executives and employees following the business unit's acquisition.

52.     By acquiring Nichicon's former tantalum electrolytic Capacitors division, AVX has effectively purchased a participant in the unlawful cartel alleged herein and has thereby joined and participated in Defendants' conspiracy through this business unit's acts taken in furtherance of the conspiracy.

**Rubycon Defendants**

53.     Defendant Rubycon Corporation ("Rubycon") is a Japanese corporation with its principal place of business located at 1938-1, Nishi-Minowa, Ina-City, Nagano 399-4593, Japan. During the Conspiracy Period, Rubycon manufactured, sold, and distributed aluminum and/or film Capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

54.     Defendant Rubycon America Inc. ("Rubycon America"), an Illinois corporation, is a wholly-owned subsidiary of Rubycon with its principal place of business

14

located at 4293 Lee Avenue, Gurnee, Illinois 60031. During the Conspiracy Period, Rubycon America—either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers aluminum and/or film Capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, Rubycon.

### **ELNA Defendants**

55.     Defendant ELNA Co., Ltd. ("ELNA"), is a Japanese corporation with its principal place of business located at 3-8-11 Shin-Yokohama, Kohoku-ku, Yokohama, Kanagawa Prefecture 222-0033, Japan. During the Conspiracy Period, ELNA manufactured, sold, and distributed aluminum and/or film Capacitors either directly or through its business units, subsidiaries, agents or affiliates, to United States purchasers.

56.     Defendant ELNA America Inc. ("ELNA America") a California corporation, is a wholly-owned subsidiary of ELNA with its principal place of business located at 879 West 190th Street, Suite 100, Gardena, California 90248. During the Conspiracy Period, ELNA America—either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers aluminum and/or film Capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, ELNA.

57.     Defendants ELNA and ELNA America are together referred to herein as the "ELNA Defendants."

### **Matsuo**

58.     Defendant Matsuo Electric Co., Ltd. ("Matsuo") is a Japanese corporation with its principal place of business located at 3-5- Sennari-cho, Toyonaka-shi, Osaka 561-

15

8558, Japan. During the Conspiracy Period, Matsuo manufactured, sold and distributed electrolytic and/or film Capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

## TOSHIN KOGYO

59.     Defendant TOSHIN KOGYO Co., Ltd. ("TOSHIN KOGYO") is a Japanese corporation with its principal place of business at Tsukasa Bldg. 2-15-4, Uchikanda Chiyoda-ku, Tokyo, Japan. During the Conspiracy Period, TOSHIN KOGYO manufactured, sold, and distributed electrolytic and/or film Capacitors either directly or through its business units, subsidiaries, agents or affiliates, to United States purchasers.

## Holy Stone Defendants

60.     Defendant Holy Stone Enterprise Co., Ltd. ("Holy Stone") is a Taiwanese corporation with its principal place of business at 1 Floor, No. 62, Sec. 2, Huang Shan Road, Nei Hu District, Taipei, Taiwan. From in or about December 2009 until on or about June 11, 2014, Holy Stone manufactured, sold and distributed tantalum Capacitors, either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

61.     In or about December 2009, Holy Stone publicly announced its acquisition of Hitachi AIC's tantalum and niobium Capacitors division. The acquisition was completed by or about April 1, 2010, and the tantalum and niobium Capacitors division was renamed Holy Stone Polytech Co., Ltd. ("Holy Stone Polytech"), a Japanese corporation and wholly-owned subsidiary of Holy Stone with its principal place of business located at Ohdaira, Miharu, Fukushima 963-7704, Japan. On or about June 11, 2014, Vishay Intertechnology, Inc. announced its acquisition of Holy Stone Polytech from

Holy Stone. From in or about December 2009 until on or about June 11, 2014, Holy Stone Polytech— either directly or through its business units, subsidiaries, agents or affiliates, or those of its corporate parent, Holy Stone—manufactured, sold and distributed tantalum Capacitors to United States purchasers. To the extent that the assets and liabilities of Holy Stone Polytech remain in whole or in part with Holy Stone subsequent to its sale to Vishay, Defendants intend to hold Holy Stone liable for any of Holy Stone Polytech's violations of Sherman Act § 1 during the Conspiracy Period.

62.     Defendant HolyStone International ("HolyStone International")—which publicly claims to be a "subsidiary company" of Holy Stone—is a business entity with its principal place of business located at 41700 Ivy Street, Suite D, Murrieta, California 92562. HolyStone International is not registered with the California Secretary of State as either a foreign or domestic corporate entity but maintains a website identifying itself as Holy Stone's "direct sales office for North America." From in or about December 2009 until on or about June 11, 2014, HolyStone International— either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers tantalum Capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, Holy Stone (including, without limitation, Holy Stone Polytech).

63.     Holy Stone, Holy Stone Polytech (following its establishment as a wholly-owned subsidiary of Holy Stone until its acquisition by Vishay Intertechnology) and HolyStone International are together referred to herein as the "Holy Stone Defendants."

## ROHM

64.    Defendant ROHM Co., Ltd. ("ROHM") is a Japanese corporation with its principal place of business located at 21 Saiin Mizosaki-cho, Ukyo-ku, Kyoto 615-8585, Japan. During the Conspiracy Period, ROHM manufactured, sold, and distributed tantalum and/or film Capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

## EPCOS

65.    EPCOS AG ("EPCOS") is a German corporation with its principal place of business located at St-Martin-Strasse 53, 81669 Munich, Germany. During the Conspiracy Period, EPCOS—either directly or through its own business units, subsidiaries, agents or affiliates—manufactured, sold and distributed electrolytic and/or film Capacitors to United States purchasers.

## Okaya

66.    Defendant Okaya Electric Industries Co., Ltd. ("Okaya") is a Japanese corporation with its principal place of business located at 16-9, Todoroki 6 chome, Setagaya-ku, Tokyo 158-8543, Japan. During the Conspiracy Period, Okaya manufactured, sold and distributed film Capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

## Taitsu Defendants

67.    Defendant Taitsu Corporation ("Taitsu") is a Japanese corporation with its principal place of business located at 2-23-20, Kizuki, Nakahara-ku, Kawasaki, Kanagawa 211-0025, Japan. During the Conspiracy Period, Taitsu manufactured, sold and distributed

film Capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

68.     Defendant Taitsu America, Inc. ("Taitsu America"), a California corporation, is a wholly-owned subsidiary of Taitsu with its principal place of business located at 6160 Mission Gorge Road, Suite 100, San Diego, California 92120. During the Conspiracy Period, Taitsu America—either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers film Capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, Taitsu.

69.     Defendants Taitsu and Taitsu America are together referred to herein as the "Taitsu Defendants."

### Shinyei

70.     Defendant Shinyei Kaisha ("Shinyei") is a Japanese corporation with its principal place of business located at 77-1 Kyomachi, Chuo-ku, Kobe 651-0178, Japan. During the Conspiracy Period, Shinyei manufactured, sold and distributed film Capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

### Nitsuko

71.     Defendant Nitsuko Electronics Corporation ("Nitsuko") is a Japanese corporation with its principal place of business located at 2031-1, Ogawara, Suzaka-shi, Nagano-ken, 382-0071, Japan. During the Conspiracy Period, Nitsuko either directly or through its business units, subsidiaries and affiliates, manufactured, sold and distributed film Capacitors to United States purchasers.

19

**Nissei**

72.     Defendant Nissei Electric Co. Ltd. ("Nissei") is a Japanese corporation with its principal place of business located at 1509-17 Okubo-cho, Nishi-ku, Hamamatsu-shi, Shizuoka-ken 4328006, Japan. During the Conspiracy Period, Nissei either directly or through its business units, subsidiaries agents and affiliates, manufactured, sold and distributed film Capacitors to United States purchasers.

**Soshin**

73.     Defendant Soshin Electric Co., Ltd. ("Soshin") is a Japanese corporation with its principal place of business located at 3-13-16, Mita, Minato-ku, Tokyo 108-8322, Japan. During the Conspiracy Period, Soshin either directly or through its business units, subsidiaries, agents and affiliates, manufactured, sold or distributed film Capacitors to United States purchasers.

## CO-CONSPIRATORS AND AGENTS

74.     The anticompetitive and unlawful acts alleged against the Defendants and Conspirators in this complaint were authorized, ordered or performed by Defendants and Conspirators and their respective directors, officers, agents, employees, or representatives, while actively engaged in the management, direction or control of Defendants' and Conspirators' businesses or affairs.

75.     Various persons and/or firms not named as Defendants herein have participated as Co-Conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.

76.     Known Co-Conspirators not named as Defendants herein include but are not limited to Panasonic Corporation; Panasonic Corporation of North America; SANYO

20

Electric Co., Ltd.; SANYO North America Corporation; Fujitsu Ltd.; Fujitsu Components America, Inc.; Fujitsu Semiconductor America, Inc.; TDK-EPC Corporation; TDK U.S.A. Corporation; Vishay Intertechnology, Inc;  and Vishay Polytech Co., Ltd.

## TRADE AND COMMERCE

77.     During the Conspiracy Period, each Defendant, directly or through one or more of its respective parents, subsidiaries, business units, agents or affiliates, sold and/or delivered to United States purchasers electrolytic and/or film Capacitors in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

78.     During the Conspiracy Period, the Conspirators collectively controlled the respective markets for the sale of electrolytic and film Capacitors, both globally and in the United States.

79.     The Conspirators engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

80.     The Capacitors manufactured abroad by the Defendants and sold in the United States constitute domestic or import commerce.

81.     Defendants' illegal conduct involved U.S. import trade or import commerce. Defendants knowingly and intentionally sent price-fixed electrolytic and film Capacitors into a stream of commerce that they knew led directly into the United States, one of their most important markets and a major source of their revenues. In this respect, they directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed electrolytic and film Capacitors to enter the United States market and inflating the prices of electrolytic and film Capacitors destined for the United

21

States. Such conduct was meant to produce and did in fact produce a substantial effect in the United States in the form of higher prices.

82.     The U.S. electrolytic and film Capacitor market is enormous and was a major focus of and very important to the conspiracy. Defendants and others shipped millions of electrolytic and film Capacitors, including those incorporated into finished products, into the United States during the respective Conspiracy Period for ultimate resale to U.S. consumers. As a result, a substantial portion of defendants' revenues were derived from the U.S. market. Defendants spent hundreds of millions of dollars on advertising their products in the United States.

83.     Because of the importance of the U.S. market to defendants and their Co-Conspirators, electrolytic and film Capacitors and/or electronic products containing electrolytic and film Capacitors intended for importation into and ultimate consumption in the United States were a focus of Defendants' illegal conduct. Defendants knowingly and intentionally sent price-fixed electrolytic and film Capacitors and/or electronic products containing electrolytic and film Capacitors into a stream of commerce that led directly into the United States. Many electrolytic and film Capacitors were intended for incorporation into finished products specifically destined for sale and use in the United States. This conduct by Defendants was meant to produce and did in fact produce a substantial effect in the United States in the form of artificially-inflated prices for electrolytic and film Capacitors and/or electronic products containing electrolytic and film Capacitors.

84.     During the respective Conspiracy Period, every Defendant shipped electrolytic and film Capacitors directly into the United States. Defendants also

manufactured and sold electrolytic and film Capacitors to individuals and entities, including Flextronics, and Defendants knew those Capacitors would be incorporated into electronic products that would be shipped directly into the United States.

85.     When high-level executives based at Defendants' Asian headquarters agreed on prices, they knew that their price-fixed electrolytic and film Capacitors would be incorporated into products containing electrolytic and film Capacitors sold in the United States. Moreover, because electrolytic and film Capacitors are—and were throughout the Conspiracy Period—a significant component of electronic products containing electrolytic and film Capacitors, Defendants knew that price increases for electrolytic and film Capacitors would necessarily result in increased prices for electronic products containing electrolytic and film Capacitors sold in the United States. Many Defendants manufactured products containing electrolytic and film Capacitors and sold them in the United States.

86.     For the reasons set forth above, Defendants' illegal conduct involved import trade or import commerce into the United States.

87.     To the extent any Capacitors are purchased in the United States and these purchases do not constitute domestic or import commerce, the Defendants' unlawful activities with respect thereto, as more fully alleged herein, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce that gives rise to the claims asserted herein.

88.     The Defendants sold Capacitors overseas directly to Flextronics and its affiliates for incorporation into products manufactured overseas for import into the United States.

23

89.     Defendants often specifically targeted United States companies that were Flextronics's customers and companies manufacturing products for use by United States end-users.   These agreements were intended to and did cause direct, foreseeable and substantial harm to U.S. commerce.

90.     Defendants' sales of Capacitors to Flextronics for the manufacture of products that were intended for sale to United States customers or end-users involved import commerce, and had a substantial, direct and reasonable foreseeable effect on United States import commerce that gives rise to a claim under United States law.

91.     The anticompetitive conduct described herein directly caused antitrust and other injury to Flextronics and gives rise to the claims asserted herein, including a Sherman Act claim.   The anticompetitive conduct caused Flextronics to pay supra-competitive prices for Capacitors.

92.     The anticompetitive conduct also caused persons in the United States to pay supra-competitive prices for manufactured products imported by Flextronics that incorporate Capacitors purchased from the Defendants.

93.     In each of these categories, the resulting price increases amounted to tens of millions of dollars in inflated Capacitor prices and thus were substantial.

## **FACTUAL ALLEGATIONS**

## I.  OVERVIEW OF CAPACITOR FUNCTIONALITY

94.     Capacitors are electronic components.   Virtually every electrical circuit contains one or more Capacitors. In the taxonomy of electrical components, Capacitors are categorized as "passive" components because they do not require electrical power to

operate.   The physical properties of the materials that compose a passive component cause it to perform.

95.     Generally, Capacitors serve as reservoirs of electrical charge that smooth out inconsistencies in both source current available and the load current demanded by a device requiring the current. Most primary electrical sources have slowly varying current delivery, but many electrical devices will require changing load current demands in fractions of a second. Capacitors ensure that the load current demands for the circuits and devices in which they are installed are met.  The amount of charge the Capacitor can hold at a given voltage defines its capacitance.

96.     In its basic form, a Capacitor consists of two or more parallel conductive metal plates that are not connected to or touching each other, but are electrically separated by some form of insulating, non-conductive material. The insulating layer between a Capacitor's plates is the dielectric. When a voltage is applied to the two plates, an electric field is created between them; positive charge will collect on one plate and negative charge on the other.  The dielectric, a non-conductive material, does not permit the electric current to flow between the metal plates.

97.     The most commonly used dielectrics used in Capacitors are aluminum or tantalum plates (often covered by a dielectric metallic oxide layer), insulating plastic film, and ceramic materials.

## II.  TYPES OF CAPACITORS

98.     Capacitors are usually distinguished as either electrolytic or electrostatic. Electrolytic Capacitors are polarized, meaning that they have positive and negative leads. Electrostatic Capacitors are not polarized.

99.     Electrolytic and electrostatic Capacitors are further distinguished by the material from which their dielectrics are made. The majority of electrolytic Capacitors sold contain aluminum or tantalum dielectrics.  Ceramic Capacitors and film Capacitors are electrostatic.

100.     Electrolytic Capacitors have historically offered higher capacitance than electrostatic Capacitors.  As a result, they are often used for power filtering, coupling or buffering in sophisticated electronic devices, such as televisions, computers, mobile phones, smart phones, tablets, and technology used by the medical, military industrial and aerospace industries.

**A.  Electrolytic Capacitors**

**1.      Aluminum Capacitors**

101.     Aluminum Capacitors generally use aluminum foil for their anodes and cathodes. Aluminum Capacitors can be distinguished by the type of electrolyte they employ.

102.     Conventional aluminum Capacitors are composed of two aluminum foils and a paper spacer soaked in a liquid electrolyte.  The anode aluminum foil is covered with an aluminum oxide layer that serves as the dielectric, while the uncoated foil acts as a cathode. The anode, electrolyte-soaked paper and cathode are stacked together, and the stack is then wound up, placed into a cylindrical enclosure usually made of aluminum and connected to an electric circuit through being surface mounted on PCBs or attached by radial or axial leads.

103.     Polymer aluminum Capacitors differ from conventional aluminum Capacitors in that they contain a solid conductive polymer in place of an electrolyte-

soaked paper spacer. Polymer aluminum Capacitors are either constructed in the same fashion as conventional aluminum Capacitors or they are layered and packaged in a molded resin to be used as compact surface mount devices.

104.    In both conventional and polymer aluminum Capacitors, the thinness of the aluminum oxide layer dielectric on the anode foil allows for high capacitance, though their capacitance can only increase by increasing the surface area covered by the dielectric. This, however, increases the Capacitors' physical size. As a result, aluminum Capacitors may have lower volumetric efficiency in comparison to many tantalum, ceramic or film Capacitors.

105.    The polymer electrolytes used in polymer aluminum Capacitors typically have higher conductivity than the liquid electrolyte used in conventional aluminum Capacitors, resulting in lower equivalent series resistance (*i.e.*, an obstruction in the flow of electric charge in and out of a Capacitor) ("ESR").  Additionally, because the polymer electrolyte used in a polymer aluminum Capacitor is a solid and therefore cannot dry out, polymer aluminum Capacitors typically have longer service lives than conventional aluminum Capacitors.

106.    Both types of aluminum Capacitors are used in a variety of electronic devices, such as consumer audio and video devices, televisions, video game consoles, desktop and laptop computers, automotive electronics and power inverters.  Conventional aluminum Capacitors have been used for decades and are therefore prevalent in the electric circuits found in older electronic devices.   In contrast, polymer aluminum Capacitors first became available in the mid-1980s and are frequently found in newer electronic devices.

FLEXTRONICS INTERNATIONAL USA, INC.'S COMPLAINT

107.    Conventional aluminum Capacitors and polymer aluminum Capacitors are together referred to herein as "aluminum Capacitors."

## 2.    Tantalum Capacitors

108.    Tantalum Capacitors exploit the tendency of tantalum metal to form a non-conductive protective tantalum oxide surface layer. They consist of tantalum powder sintered (*i.e.*, formed by high pressure) together—often called a "pellet"—as the anode of the Capacitor, with tantalum oxide forming on the pellet's surface serving as the dielectric. The tantalum pellet is very porous, and therefore has more surface area for the dielectric oxide layer to cover.   The greater surface area increases the Capacitors' capacitance.

109.    Like aluminum Capacitors, tantalum Capacitors can be distinguished by the materials they employ. Conventional "wet" and "dry" slug tantalum Capacitors use a sintered tantalum metal pellet as an anode on which the dielectric oxide layer is formed. The cathode is formed from a manganese dioxide layer separated from the dielectric by either liquid or solid electrolyte. A polymer tantalum Capacitor instead forms the cathode from a conductive polymer.

110.    Conventional tantalum Capacitors are typically attached to an electric circuit through radial or axial leads. However, certain types of "dry slug" tantalum Capacitors and polymer tantalum Capacitors are available in both leaded and surface mount models. Surface mount Capacitors are usually composed of layered tantalum and the oxide dielectric packaged in a compact molded resin case.

111.    The dielectric layer in both conventional and polymer tantalum Capacitors can be very thin—thinner than the similar layer in comparable aluminum Capacitors.

28

Accordingly, both types of tantalum Capacitors can have high capacitance in a small volume and thus can have high volumetric efficiency.

112.    Both types of tantalum Capacitors have high resistance to leaking charge and have lower ESR than aluminum Capacitors of the same capacitance rating. Accordingly, both types of tantalum Capacitors frequently are used in complex electronic devices in which small size and high capacitance are both required, *e.g.*, mobile phones, smart phones, personal computers, tablet devices and automotive electronics.

113.    Conventional tantalum Capacitors and polymer tantalum Capacitors are together referred to herein as "tantalum Capacitors."

**B.  Film Capacitors**

114.    Film Capacitors are non-polarized Capacitors typically comprised of two pieces of plastic film. This film is made extremely thin using a drawing process. Once the film is manufactured, it may be metallized or left untreated.  After the film is drawn to the desired thickness, the film is cut into ribbons.   The width of the ribbons depends on the capacity of the Capacitor being produced.  Two ribbons of film are wound together into a roll, which is often pressed into an oval shape so that it can fit into a rectangular case.  Electrodes are added by connecting each of the two electrodes to one of the films. There are many types of film Capacitors, including polyester film, metallized film, polypropylene film, polytetrafluoroethylene ("PTFE") film and polystyrene film. The primary difference between these types of film Capacitors is the material used as the dielectric.

115.    Film Capacitors offer stability of electrical values over sustained usage, reliability (low self-inductance and ESR), and low cost.  The reliability and stability of

29

film Capacitors make them useful for many industrial applications and general-purpose applications in electronics.

## III.   THE CAPACITOR CARTEL

### A.   Overview of the Cartel's Activities

116.   The Conspiracy artificially inflated the price of electrolytic and film Capacitors during the Conspiracy Period.[1]   Conspirators Elna, Matsuo, NEC Tokin and Nichicon participated in conspiratorial acts to artificially inflate the price of electrolytic Capacitors.   The Nissei, Nitsuko, Okaya, Shinyei, Soshin, Taitsu, and Toshin Kogyo Conspirators engaged in conspiratorial acts to increase the price of film Capacitors. Conspirators Hitachi, NCC, Rubycon & Panasonic engaged in conspiratorial acts to inflate the price of both types of Capacitors.

117.   Conspiratorial agreements included both agreements involving all or substantially all of the conspiring market participants and agreements involving various sub-groups of the Conspirators.

118.   At the industry-wide level, the Conspirators routinely met as a group to exchange industry pricing, market, and output information, including information regarding future pricing plans.

119.   During these industry-level meetings, which apparently included separate meetings addressing the electrolytic and film Capacitor markets, the Conspirators reached

---

[1] Flextronics has not participated in formal discovery in this action, and thus acknowledges that its knowledge regarding the nature of the Conspiracy or Conspiracies at issue is somewhat limited at this point.   Flextronics expects discovery to clarify whether the cartel operated as a single conspiracy or two conspiracies, as well as uncover specific facts relating to the Conspiracy, including the identity of each cartel participant, the location of cartel meetings, and the dates of conspiratorial communications.

agreements with regard to various global and regional Capacitor markets, and exchanged and agreed-upon specific prices for certain products and specific market shares.

120. Industry-level meetings discussing the electrolytic Capacitor market were variously called Electrolytic Capacitor ("ECC") meetings, Tantalum Capacitor ("TC") meetings, and KCC Hananoki meetings between 1999-2003; the Aluminum Tantalum Capacitor (also called the AT statistics group) meetings between 2003 and 2005; and Marketing Group Study Meetings from 2005 until the end of the Conspiracy.

121. Industry-level meetings involving the film Capacitor market included the Singapore meetings, which began no later than 1999; the Kuala Lumpur ("KL") meetings, which began no earlier than 2004; the Japan Film Capacitor ("JFC") meetings, which took place beginning no later than 2007; and the FF meetings, which began no later than 2008.

122. At both the industry-wide meetings targeting the electrolytic Capacitor market and those targeting the film Capacitor market, the Conspirators reached agreements to artificially inflate the price of Capacitors sold to Flextronics. These agreements included agreements to fix prices at artificially high levels, agreements to resist efforts by customers to obtain discounts, agreements to allocate customers and markets among the Conspirators, and other unlawful agreements.

123. At both the industry-wide meetings targeting the electrolytic Capacitor market and those targeting the film Capacitor market, the Conspirators exchanged specific information regarding Flextronics and its customers in furtherance of the Conspiracy. This information included highly confidential information regarding

31

Flextronics and its customers that had been provided to individual members of the Conspiracy pursuant to contractual guarantees of confidentiality.

124.   In addition to conspiring at industry-wide meetings such as the ones described above, various members of the conspiracy met and reached unlawful agreements involving only sub-groups of the Conspirators.   Meetings of sub-groups of the Conspirators occurred at various times around the larger Conspiracy meetings and on an *ad hoc* basis as necessary.   At such meetings, sub-groups of the Conspirators met and communicated to discuss and agree upon specific market allocations and prices for sales to individual large customers, including Flextronics.

125.   For example, in October of 2010, a sub-group of the Conspirators exchanged production increase numbers relating to a United States corporation that is a key Flextronics customer.   This information was exchanged in an effort to maintain artificially high price levels by monitoring an ongoing market-share agreement with regard to sales of Capacitors used in the manufacture of the customer's products.

126.   Because Flextronics was the direct purchaser of the Capacitors to be used in the targeted customer's products, the Conspirators' agreement to artificially inflate the price of Capacitors sold to this United States customer caused Flextronics to pay artificially inflated prices for Capacitors purchased to manufacture products for that customer.

**B.   Industry-Wide Conspiratorial Activities and Communications**

127.   Starting no later than January 1, 2003, the Conspirators began meeting to discuss and exchange competitively sensitive information.

32

128.     As one attendee of these meetings noted around this time, the purpose of the cartel meetings was to "exchange information by market and by Capacitor category so that each company will be able to enjoy profits and that healthy market prices will be maintained."

129.     These meetings, which related to electrolytic Capacitors, were an outgrowth of regular meetings conducted among certain Conspirators dating back to the 1990s in which the participants exchanged pricing and sales data.

130.     As set forth above, the Conspirators used various acronyms to describe the conspiratorial meetings, including "ATC," "MK" or "JFC."  The meetings were generally organized in accord with the type of Capacitor to be discussed.  ATC and MK meetings were usually held among manufacturers of electrolytic Capacitors.

131.     The JFC meetings involved manufacturers of film Capacitors. A number of manufacturers that produced both electrolytic and film Capacitors sent separate representatives to meetings related to both electrolytic and film Capacitors.  Each of these meetings constituted overt acts in furtherance of the conspiracy.

132.     Meeting rosters during the period from 2003 to 2008 indicate that officers, managers and/or employees of the following companies participated in or were informed of the cartel's regular meetings: ELNA; Hitachi AIC; Holy Stone; KEMET; Matsuo; NEC TOKIN; Nichicon; Nippon Chemi-Con; Nissei; Nitsuko; Okaya; ROHM; Rubycon; Shinyei; Soshin; Taitsu; and TOSHIN KOGYO.  Known Co-Conspirators Panasonic, SANYO, and Fujitsu (FMD) also participated in or were informed of the cartel's regular meetings from 2003 to 2008.

133.    Nippon Chemi-Con, Rubycon, Hitachi AIC and Panasonic/SANYO each played a key role in organizing the cartel's regular meetings and coordinating the operation of the cartel during the Conspiracy Period, because each of these companies manufactured both electrolytic Capacitors and film Capacitors and each is a dominant manufacturer of these Capacitors.

134.    The Conspirators generally held one-day meetings attended by manager-level employees on a monthly basis.  These meetings focused on the exchange of competitively sensitive data, such as production volumes, current and future excess capacity, current and future pricing, and various statistical data relating to both the market as a whole and major customers, including specifically Flextronics. Representatives of each conspirator presented competitively sensitive information to the other cartel members.

135.    After the one-day meetings, the attendees frequently socialized with each other, and sub-groups of Conspirators reached agreements regarding specific customers of those Conspirators, as described at paragraphs 160-69, *supra*.

136.    The Conspirators also held two-day meetings generally attended by more senior officers and managers.  These meetings took place about twice a year, typically in the Spring and another in November.  The first day the meetings consisted of discussions in which officials from each of the Conspirators in attendance would make formal presentations to the group as a whole. In this forum, representatives for each Conspirator in attendance addressed the other cartel meeting members to disclose and discuss competitively sensitive information regarding the environment their respective Capacitor businesses faced.

FLEXTRONICS INTERNATIONAL USA, INC.'S COMPLAINT

137.    The information exchanged typically included current and historic sales performance in both Japanese and overseas markets, including the United States; current customer demands and customer industry trends; future intentions concerning pricing and production with regard to significant types of Capacitors at different times; and information regarding key Capacitors purchasers, including Flextronics.

138.    At these meetings, the Conspirators frequently recommended and agreed upon cartel pricing with the other cartel members.

139.    The Conspirators also used these two-day meetings to discuss and agree on the uniform denial of certain price reduction requests, as well as the uniform adjustment of prices to account for raw materials costs, among other things.

140.    Some of the Conspirators' industry-wide agreements specifically targeted Flextronics.

141.    The second day of the two-day meetings provided the participants the opportunity to socialize informally and discuss business.  Sub-groups of the Conspirators often used this time to reach specific agreements with regard to individual purchasers, as described *supra*, at paragraphs 160-69.

142.    Defendants also met and shared information pertaining to the fixed and variable input costs that impacted their product pricing (*e.g.*, raw materials costs, labor costs), current and future price intentions, production statistics, and their reactions and suggestions regarding market and customer demand.

143.    For some specific conspirator groups such as the groups targeting the film Capacitor market, meetings were held less frequently, typically every one to three months.

144.   In these meetings the attendees addressed targeted issues, such as the cartel's facilitation of uniform price increases on film Capacitors because materials costs had increased, thereby threatening Defendants' profitability if they had to compete against each other.

145.   Based on the recommendations and agreements reached at these different cartel meetings, the Conspirators intended to and did agree to price Capacitors collusively, stand united against price reduction demands by made by Flextronics and other customers, and set production and delivery dates to collusively control supply in the electrolytic Capacitor markets.

146.   Examples of industry-wide meetings include the following:

a.   Representatives from Panasonic and Nissei, as well as others, attended cartel meetings held during the 4th Quarter of 2007.  At these meetings, the attendees discussed, among other things, their plans to increase film Capacitor prices despite customer requests for price reductions.   The attendees also discussed specific pricing intentions regarding specific customers.

b.   Representatives from TOSHIN KOGYO, Hitachi AIC, Soshin, Nitsuko, Nissei, Okaya, Taitsu, and Shinyei attended cartel meetings held during the 2nd Quarter of 2008.  In these meetings, the Defendant attendees discussed, among other things, customer pricing, including implementing price hikes and non-Japan market conditions. Specifically, certain of the attendees agreed to stabilize prices and resist customer efforts to request price reductions.

36

FLEXTRONICS INTERNATIONAL USA, INC.'S COMPLAINT

c.  Representatives from NEC TOKIN, Nippon Chemi-Con, Matsuo, Rubycon, ELNA, Hitachi AIC, Nissei, Okaya, Taitsu, Nitsuko, Shinyei, TOSHIN KOGYO, KEMET and Sanyo attended cartel meetings held during the 3rd Quarter of 2008.  Attendees addressed current sales data, current pricing information, and specific customers.  The attendees reached agreements about, *inter alia*, increased pricing for electrolytic Capacitors; suggested cooperation among certain cartel members in broad price negotiations regarding polymer aluminum Capacitors; and discussed raw materials (plastic film) price hikes.

d.  Representatives from Nissei, Panasonic, Taitsu, Shinyei, Rubycon, Okaya, NEC TOKIN, Nippon Chemi-Con, Matsuo, FMD, ELNA, Hitachi AIC and SANYO attended cartel meetings during the 4th Quarter of 2008. At these meetings, the attendees discussed, *inter alia*, film Capacitor price increases; current production status; market conditions in foreign markets, including North America; and ending price competition on film Capacitors.

e.  Representatives from Panasonic, Okaya, Nissei, Shinyei, Taitsu, Nitsuko and TOSHIN KOGYO attended cartel meetings during the 1st Quarter of 2009. At these meetings, the attendees discussed, among other things, customer requests for price reductions and agreed among themselves to resist price decreases and stabilize their film Capacitor prices.

f.  Representatives from Nichicon, Rubycon, Nippon Chemi-Con, Matsuo, ELNA, Hitachi AIC, FMD, and SANYO attended cartel meetings during the 2nd Quarter of 2009. At these meetings, the attendees discussed, among

37

other things, their current sales data, current pricing information, industry and specific customer demands, and raw materials pricing. Specifically, the attendees also discussed their future production intentions with regard to aluminum and tantalum Capacitors; sales trends for aluminum Capacitors; cost of raw materials; and the impact of decreasing prices for ceramic Capacitors.

g.   Representatives from Nichicon, Rubycon, Nippon Chemi-Con, Matsuo, Hitachi AIC, ELNA and SANYO attended cartel meetings during the 3rd Quarter of 2009. At these meetings, the attendees discussed, *inter alia*, current sales data, current pricing information, industry and specific customer demands, and future production intentions with regard to aluminum and tantalum Capacitors.   Attendees also discussed various supply restriction options aimed at increasing the price of tantalum Capacitors; mechanisms for avoiding price competition among cartel members; ways to meet demand for electrolytic Capacitors; mechanisms to eliminate excess capacity; and the cartel members' punishment for and criticism of another cartel member for allegedly cheating on the conspiracy.

h.   Representatives from Nichicon, Rubycon, Nippon Chemi-Con, Matsuo, Hitachi AIC, ELNA and SANYO attended cartel meetings during the 4th Quarter of 2009. At these meetings, attendees discussed, *inter alia*, current sales data; current pricing information; industry and specific customer

demands; future Capacitors production intentions; and price increases for electrolytic Capacitors.

    i.    Representatives from NEC TOKIN, Nichicon, Rubycon, Nippon Chemi-Con, Hitachi AIC, ELNA and SANYO attended cartel meetings during the 1st Quarter of 2010. At these meetings, the attendees discussed, among other things, their current sales data; current pricing information; industry and specific customer demands; and future production intentions with regard to electrolytic Capacitors.

    j.    Representatives of NEC TOKIN, Nippon Chemi-Con, Rubycon, Matsuo, ELNA, ROHM and Holy Stone attended cartel meetings held in the 2nd Quarter of 2010. At these meetings, the attendees discussed, among other things, their current sales data; current pricing information; industry and specific customer demands and trends; capacity; future Capacitors production intentions; and costs of raw materials.

    147.    The Conspirators' meetings at times focused discussions on specific topics of concern, and sub-groups were formed to discuss, address, and resolve these issues.

    148.    For example, an "Overseas Trade Sectional Meeting" of the "ATC Group" was formed among certain Conspirators at least as early as August 2003. The ATC Group discussed and mutually agreed upon prices for aluminum and tantalum Capacitors in non-Japanese markets, including the United States.

FLEXTRONICS INTERNATIONAL USA, INC.'S COMPLAINT

149.   Representatives from NEC TOKIN, ELNA, Nippon Chemi-Con, Nichicon, Rubycon, FMD, Matsuo, SANYO and Hitachi AIC, Inc. participated in the "Overseas Trade Sectional Meeting" discussions.

150.   The Conspirators maintained and enforced the concerted pricing on Capacitors and other cartel activity through, *inter alia*, regular interactions and agreements reached among members of the Conspiracy—both in regular, organized meetings and through *ad hoc* meetings and correspondence—and through communications and agreements on current and future pricing intentions and related topics.

151.   The Conspirators monitored the prices of their fellow cartel members during the Conspiracy Period and punished those who sought to stray from the agreed pricing. Once the cartel members learned of a deviation from coordinated pricing, pricing for the product at issue would either adjust back to the price collusively determined by the cartel's members or the Conspirator that sought to benefit individually from pricing information obtained through its membership in the cartel would face retribution from the cartel's members, such as exclusion from the cartel and its collusive discussions for a period of time.

152.   For example, Nichicon and Nippon Chemi-Con were punished by the cartel and excluded at times from cartel discussions regarding price fixing in the electrolytic Capacitors markets.

153.   In addition to agreeing upon anticompetitive prices for their electrolytic and film Capacitors, the Conspirators agreed to quote similar or identical production lead times to purchasers on a concerted basis.  These agreements permitted the Conspirators to

40

artificially restrict Capacitor supply and creating the perception of a supply shortage. This situation prevented natural competitive forces from driving prices lower.

154.    Conspiratorial communications in furtherance of the Conspiracy occurred in person through both regular and *ad hoc* meetings, electronic or paper correspondence, text messaging and/or telephonic or video communications in the period before and during the Conspiracy Period.

155.    Contemporaneous notes and communications record many of the industry-wide conspiratorial meetings.

156.    Flextronics must on occasion provide its anticipated production information to major suppliers in order to ensure that Flextronics's Capacitor requirements are met.

157.    At various times the Conspirators shared this production information with each other in furtherance of the scheme to collectively avoid offering discounts to Flextronics.

158.    For example, in January of 2009, Conspirators NEC-TOKIN, Rubycon, Nippon Chemi-Con, Matsuo, ELNA and others exchanged highly confidential information regarding Flextronics's production of televisions for a major customer.

159.    Similarly, in September 2007, certain Conspirators exchanged information regarding the supposed production capacity of a specific Flextronics manufacturing facility.

41

### C.    Agreements and Communications Among Sub-Groups of the Conspirators

160.    In addition to the industry-wide discussions and agreements identified above, the Conspirators also reached anticompetitive agreements with regard to individual purchasers, including Flextronics and Flextronics's customers.

161.    For example, SANYO regularly met with and discussed Capacitor sales with NEC TOKIN and Nippon Chemi-Con, two of its primary competitors in the electrolytic Capacitor market.  These frequent discussions, usually conducted by email or personal communication among employees of these companies, concerned eliminating price competition and artificially setting concerted prices with regard to specific customers, including both Flextronics and customers of Flextronics.

162.    Similarly, in 2009, AVX reached agreements with regard to Capacitor pricing with KEMET.  This agreement was shared with Sanyo, and is reflected in an internal Sanyo document.  The document asks recipients of the information to "please refrain yourselves from forwarding the AVX section of the report."

163.    KEMET also cooperated with Sanyo with regard to Capacitor pricing, and reached a specific agreement with Sanyo not to compete with KEMET in the United States market.

164.    Similarly, SANYO and Nippon Chemi-Con reached an agreement to allocate between them the sales to specific United States companies for which Flextronics purchased Capacitors to be used in the manufacture of electronic products to be distributed to the United States.

165.    Subgroups of the Conspirators also collusively allocated sales of Capacitors to be used in certain products manufactured by Flextronics for its United

42

States customers.   The participating Conspirators understood when making these agreements that the market allocation would increase prices to United States businesses – many of which are identified by name – and United States consumers.

166.    Subgroups of the Conspirators that sold particular types of Capacitors to Flextronics's United States customers also specifically agreed on prices to be charged to those United States customers.

167.    Subgroups of the Conspirators also exchanged data specifically referencing Flextronics's operations in the United States and other United States purchasers.

168.    Other examples of bilateral agreements include the following:

    a.  EPCOS and SANYO met at a trade show to discuss their tantalum Capacitors, conducted an exchange of competitively sensitive information, agreed to make such exchanges in the future so that they could cooperate on future pricing.

    b.  SANYO employees regularly participated in meetings with senior executives from EPCOS to exchange confidential pricing and production information.  SANYO engaged in similar discussions with AVX regarding Capacitor sales and business strategy.

    c.  AVX also worked to coordinate pricing strategy between SANYO, KEMET and itself.

    d.  AVX also worked to coordinate current and future pricing strategy between NEC TOKIN, KEMET and itself.

43

e.  NEC TOKIN confirmed to other cartel members Capacitor current and previous price increases made by AVX, KEMET and itself.

169.   The discussions, exchange of information, and agreements reached at each of these *ad hoc* meetings of sub-groups of the Conspirators constituted overt acts in furtherance of the Conspiracy.

**D.      The Conspiracy's Effect on United States Commerce**

170.   The Conspiracy specifically targeted United States commerce.   The Conspirators directly, foreseeably, and substantially affected United States commerce by specifically targeting Flextronics International USA, Inc. and other Capacitor purchasers headquartered in the United States, as well as Capacitors used in the manufacture of products for United States end-users.

171.   For example, in January of 2009, various Conspirators specifically discussed potential responses to the United States financial collapse, including how to deal with potential Chapter 11 bankruptcy filings by United States companies.   In the same meeting, one conspirator specifically noted that it "felt sorry" for a lower price it had offered a customer in the United States, and reassured its Co-Conspirators that the lower price was negotiated due to temporary pressures from an investment fund.

172.   Similarly, a "market report" circulated among the Conspirators specifically addresses the sale of notebook computers at retailer Best Buy in the United States.   This and other similar discussions were part of a scheme to raise the price of Capacitors sold to United States companies and to companies manufacturing products for United States consumers.

173.   The Conspirators engaged in specific conspiratorial discussions about the U.S. market and the likely effectiveness of the conspiracy in the United States under varying economic conditions.

174.   For example, in August of 2003, the Defendants specifically discussed market conditions in the United States and exchanged information regarding a United States auto manufacturer that purchases large quantities of Capacitors.  These discussions were undertaken in furtherance of the conspiracy and in an effort to impact United States commerce.

175.   Specific information was exchanged in furtherance of the conspiracy relating to corporations widely known to be United States entities, such as Apple, Digi-Key, Benchmark Electronics, Rockwell Automation, Intel, and many others.  On many occasions, information exchanged in furtherance of the conspiracy identified the intended victims of the conspiracy as United States companies.

176.   The Conspirators exchanged specific and highly confidential information regarding Flextronics's production of the X-Box computer gaming console for Microsoft, a United States corporation.   This was done in furtherance of a "policy not to offer discounts" to Flextronics and other entities manufacturing the X-Box for Microsoft.

177.   Several of Flextronics's largest United States-based customers also were the subject of conspiratorial discussions at the same meeting, in which the Conspirators specifically referenced a "feared price war" that could result from "excessive production" by the Conspirators.

178.   By knowingly and intentionally inflating price of an input for a product to be sold by a United States corporation or to United States end-users, the Conspirators

45

specifically targeted United States commerce and engaged in conduct that directly and foreseeably had a substantial impact on United States commerce.

179.   Defendants' concerted and collusive actions as alleged herein artificially inflated the price of Capacitors sold directly and indirectly to Flextronics.

## IV.   CHARACTERISTICS OF THE CAPACITORS MARKET FACILITATE COLLUSION

180.   The Capacitor industry has long exhibited characteristics facilitating the Conspiracy.   For example, the industry has exhibited (1) market concentration among a limited number of participants; (2) high barriers to entry; (3) mutual interchangeability of Defendants' products; (4) inelasticity of demand; (5) product commoditization; (6) weak demand in a mature market; (7) excess manufacturing capabilities and capacity; (8) a large number of purchasers with limited purchasing power; and (9) ease of information sharing among Defendants.

### A.   Market Concentration

181.   The Capacitor manufacturing industry is highly concentrated.  Under some circumstances a highly concentrated market may render an industry more conducive to the type of collusion alleged herein.

182.   Most Capacitors are sold by the small subset of manufacturers named as Conspirators herein, and are sold to a relatively small number of Original Equipment Manufacturers, contract manufacturers, and distributors.

183.   For example, approximately ten Conspirators account for the overwhelming majority of the hundreds of millions of dollars Flextronics spent on electrolytic and film Capacitors during the Conspiracy Period.

184.   This is consistent with industry data.   Globally, the thirteen largest manufacturers of aluminum Capacitors account for approximately 92% of all aluminum Capacitor sales, and the six largest manufacturers of tantalum Capacitors, KEMET, AVX, Vishay, SANYO, Hitachi AIC, and ROHM, collectively account for approximately 91% of all tantalum Capacitors sales.

185.   Thus, before and during the Conspiracy Period, Defendants and their co-Conspirators — both individually and collectively — held significant shares in already-mature markets for Capacitors.   As a result, purchasers could not avoid the effects of the conspiracy by purchasing from non-conspiring manufacturers.

186.   Fringe Capacitor manufacturers with smaller market shares in the electrolytic and film Capacitor markets face capacity, technology, and resource constraints that render them unable to successfully capture market demand even after defendants had unlawfully increased Capacitor prices by a significant amount for a non-transitory amount of time. Fringe manufacturers could not effectively undercut the cartel's concerted pricing and meet all or even a significant part of demand for Capacitors.

**B.     Barriers to Entry**

187.   Industries characterized by substantial barriers to entry are in some circumstances susceptible to cartel behavior because it is difficult for new market entrants to undercut cartel prices.  Companies seeking to manufacture and sell electrolytic and film Capacitors confront significant barriers to entry.

188.   The Capacitors manufacturing industry is a mature one dominated by established corporations, each having multinational operations, global market reach, and

47

diverse product portfolios of all types of passive electrical components.  New market entrants must have access to significant financial resources that allow them to commit the capital necessary to bring online new fabrication operations and facilities or to expand/retrofit existing ones to meet and exceed market demand and adjust to technological changes. This readily available access to capital also permits existing manufacturers the ability to establish and secure necessary supply chain commitments for all raw materials they require.  Defendants are all established manufacturers in the Capacitors industry.

189.    Setting up competitive manufacturing operations and supply chain operations is a significant financial and logistic hurdle to market entry. A new entrant seeking to build electrolytic Capacitor and/or film Capacitor fabrication operations and facilities faces not only the sizable cost of building fabrication plants, but also the costs of acquiring the necessary production technology, hiring and retaining skilled and knowledgeable manpower, and securing the raw materials and supply chain commitments necessary to manufacture competitive products. These costs would exceed hundreds of millions of dollars. Many of the Defendant manufacturers have developed internal processing capabilities for raw materials and have established relationships with raw materials producers that all but ensure that their requirements will be met.

190.    Moreover, some of the raw materials necessary to manufacture certain types of Capacitors are produced in only a limited number of regions around the world or are available from only a limited number of suppliers.

191.     For example, tantalum is the principal material used to make tantalum Capacitors. Fabrication of tantalum Capacitors accounts for over 60% of the global and

U.S. demand for tantalum. Tantalum is only mined in a few regions in the world and is designated as a "conflict mineral" pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act, Section 1502.  Accordingly, Flextronics carefully scrutinizes the chain of custody of tantalum Capacitors prior to purchase.  Any potential new tantalum Capacitor manufacturer would have difficulty securing adequate supplies of tantalum and would have to commit significant time, effort and money to audit its newly acquired tantalum supply chain.

192.     Similarly, film Capacitors became more difficult to produce over the Conspiracy Period because manufacturers encountered difficulty in securing the necessary input materials. The volume of plastic film material needed for a production run of film Capacitors is generally not large enough to make it profitable for chemical companies to manufacture the plastics.  As a result, five types of plastic material now account for over 90% of film Capacitor dielectrics: polypropylene, polyester, polyphenylene sulfide, polyethylene naphthalate, and PTFE.  A limited number of dielectric grade resin manufacturers control the global production of these plastics (*e.g.*, principally DuPont, Teijin, Toray, Mitsui, and Borealis) and these manufacturers make the required plastic materials in large batches only a few times a year.  Likewise, the converters who apply special conductive coatings to the resin usually only run large batches a few times a year, and for some specialty film coatings batches are run only once a year.

193.     These hurdles, however, are not the only barriers a new market entrant faces. For a new market entrant consistently to manufacture and sell Capacitors competitively and to create and sustain a diverse product portfolio, it must invest in

49

substantial research and development operations. Additionally, the new entrant must create and maintain global sales, marketing and distribution operations so that its products can reach Capacitor purchasers.

194. In order to be competitive, a new market entrant has to commit to significant financial and operational undertakings to establish itself in an industry where profit margins are not large and large economies of scale are necessary to reach profitability.

### C.    Mutual Interchangeability of Defendants' Capacitors

195. Electrolytic and film Capacitors of like capacitance, dielectric properties, and form factor often are interchangeable from a technical perspective. For example, from a technical perspective, one aluminum Capacitor of a given capacitance and form factor often can be substituted for a different brand of aluminum Capacitor with the same capacitance and form factors.

196. In the electronics manufacturing industry, inexpensive electrical and other components that are largely fungible are referred to as "popcorn parts." Most types of Capacitors are considered popcorn parts. The technical interchangeability of Capacitors could put downward pressure on prices in the absence of collusive market share and price increase agreements.

197. Despite Capacitors' technical interchangeability, however, Flextronics often is not in a position to change Capacitor manufacturers even in the face of a collusive price increase orchestrated by just two or three Conspirators and directed at Flextronics or a Flextronics customer for which Flextronics directly purchased Capacitors.

50

198.     Flextronics typically manufactures products pursuant to agreements with its customers that set production and delivery deadlines.  Flextronics's customers often identify only a few Capacitors manufacturers that the customer wants Flextronics to use in a particular electronic or electrical device.

199.     Customers' Capacitor manufacturer and brand preferences are based on a host of customer-specific factors, including contractual or other obligations; the customer's corporate strategic goals and relationships; marketing concerns; manufacturer location; specific pricing issues; and the performance characteristics of a particular type of Capacitor.   As a result, conspiratorial agreements between even a subset of the Conspirators can effectively impose higher prices on Flextronics and other large purchasers that cannot easily change Capacitor suppliers in the short term.

**D.     Inelastic Demand**

200.     For a cartel to profit from raising prices above competitive levels, demand must be inelastic at competitive prices such that cartel members are able to raise prices without triggering a decline in sales revenue that would make the artificial price increase unprofitable.  In simple terms, demand is inelastic when the loss in volume arising from a price increase is small relative to the magnitude of the increase in price, allowing higher prices to increase revenues and profits despite loss of sales.

201.     Demand is inelastic for aluminum, tantalum and film Capacitors. When there are few or no substitutes for a product, purchasers have little choice but to pay higher prices in order to purchase these products.  Because Capacitors are a necessary component in the electric circuits employed to make functional a wide variety of products within different end-markets, prices for Capacitors are inelastic.  No other type of passive

51

electrical component (*e.g.*, inductors, resistors) can serve as a substitute or a functional equivalent to a Capacitor in an electric circuit.

202.    In addition, Flextronics typically purchases Capacitors under deadlines tied to promised product delivery dates and thus must pay an inflated price for the Capacitors it needs for a particular manufacturing project rather than risk losing business by alienating downstream customers through missed deadlines.

203.    Demand inelasticity for Capacitors is particularly acute when a given electric circuit or an electronic device requires Capacitors with a specific capacitance, dielectric, and form factor.  In that instance, a purchaser has no choice but to buy a specific Capacitor with the required technical and operational characteristics.

E.    **Commoditization**

204.    When a product is characterized as a commodity, market participants typically compete on the basis of price rather than other attributes such as product quality or customer service. Where competition occurs principally on the basis of price, it is often easier to implement and monitor a cartel because price is more often objectively measurable and observable than non-price factors such as service.

205.    Electrolytic and film Capacitors are mass produced through standardized manufacturing processes. They are designed according to standardized technical and operational characteristics for the various mutually interchangeable models Defendants manufacture.  In short, electrolytic and tantalum Capacitors are largely commoditized.

F.    **Weak Demand**

206.    Static or declining demand is one factor that may make the formation of a collusive arrangement more likely.  When faced with weak demand conditions firms

may under certain circumstances lower prices, particularly where a competitor lowers its prices. Firms faced with static or declining demand thus have a greater incentive to collude with competitors to avoid price competition and profit erosion.

207.  Overall demand for electrolytic and film Capacitors has declined since the early 2000s. Demand for aluminum and tantalum Capacitors is closely tied to the demand for particular consumer electronics. Over the past decade, declining sales of desktop computers and television sets have weakened demand for passive electronic components and Capacitors in particular.

**G.  Excess Manufacturing Capacity**

208.  Product manufacturers with excess capacity available to meet demand may in certain circumstances lower prices. Under such circumstances collusion becomes more profitable.

209.  Before and during the Conspiracy Period, the Conspirators had excess manufacturing capacity that allowed them to expand to meet global and U.S. demand for aluminum, tantalum and film Capacitors.

**H.  Ease of Information Sharing Among Defendants**

210.  Common membership in trade associations and interrelated business relationships among the Conspirators afforded opportunities both before and during the Conspiracy Period for the Conspirators to collude. Upon information and belief, the Conspirators took advantage of these opportunities to discuss, and agree upon, pricing for the various types of Capacitors they produce.

211.  Industry trade associations may under some circumstances make a market more susceptible to collusive behavior because the association can provide a

pretext under which Conspirators can exchange sensitive company information such as pricing and market allocation.

212.     A number of industry trade associations exist to which many of the Defendant manufacturers are members. The Japan Electronics and Information Technology Industries Association ("JEITA") is a prominent trade organization that claims as members many of the Defendants and their Co-Conspirators, *e.g.*, Fujitsu, Hitachi Chemical, Matsuo, Nichicon, Nippon Chemi-Con, NEC TOKIN, Okaya, Panasonic, ROHM, Rubycon, Soshin, and TDK (the parent of TDK-EPC).

213.     JEITA is not the only industry trade association to which Defendants and their Co-Conspirators hold memberships. One of the largest trade associations for the industry, the Electronic Components Industry Association ("ECIA"), claims AVX, KEMET, Panasonic, ROHM and Vishay, among others, as members. According the ECIA, its members are granted access to "industry peers and executive networking," and events where they can be "face-to-face with leaders of the authorized electronic components industry." Likewise, the European Passive Components Industry Association provides similar networking opportunities, and it includes Nichicon, AVX and Panasonic among its members. KEMET and Panasonic are also members of the Power Sources Manufacturers Association ("PSMA"). Additionally, Defendants and their co-Conspirators regularly attend the yearly Applied Power Electronics Conference and Exposition ("APEC"), which has been held yearly since 1986 and is co-sponsored by other organizations, including the PSMA.

214.     Aside from these formalized means of exchanging information among each other, Defendants have among them numerous informal links between their former

54

and current colleagues, co-venturers, or partners employed by other Defendant companies. These links provided them the means and opportunity to exchange competitively sensitive information. Despite the billions of dollars of revenue generated by the Capacitors industry worldwide, it is still a narrow segment of the overall electronic components industry, and the key decision-makers for the major producers had personal access to each other both directly and indirectly.

## V.   U.S. AND INTERNATIONAL ANTITRUST INVESTIGATIONS INTO THE CAPACITORS INDUSTRY

215.   In April 2014, the DOJ Antitrust Division confirmed to industry sources that the government has opened an investigation into price fixing in the Capacitors industry. The investigation into the Capacitors industry is being conducted by the United States Attorney's Office for the Northern District of California.

216.   Media and industry sources have reported that this investigation has been ongoing for some time, and that the DOJ has been coordinating its efforts to investigate the Capacitors industry with the People's Republic of China's National Development and Reform Commission ("NDRC"), an agency entrusted with regulating price-related anticompetitive activity by the Chinese State Council. During March 2014, the NDRC conducted several raids on Chinese operations of Japanese Capacitors manufacturers.

217.   A member of the cartel—Co-Conspirator Panasonic—has approached U.S. and Chinese authorities to self-report its involvement in the conspiracy and to request prosecutorial leniency and amnesty.

218.   ACPERA provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily admits its conduct to the DOJ. A November 19, 2008 presentation on the DOJ's website explains that "[a conditional leniency] applicant must

55

admit its participation in a criminal antitrust violation involving price fixing...before it will receive a conditional leniency letter." One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that the applicant is not charged with a criminal offense and is not required to plead guilty to criminal charges.

219.    By applying for leniency through ACPERA, Panasonic would have had to admit to participating in unlawful competitive conduct in the Capacitors industry.

## VI.    FRAUDULENT CONCEALMENT

220.    Flextronics had neither actual nor constructive knowledge of the pertinent facts constituting its claims for relief asserted herein, despite its diligence in trying to discover such facts.

221.    Flextronics's global purchases of Capacitors are managed from the company's principal place of business in San Jose, California. Global purchases are made by five "Global Contracting Purchasers" who are responsible for all Capacitor purchases. Despite frequent contact with various Defendants' officers and employees, Flextronics did not become aware of even the possibility of a conspiracy until early 2014.

222.    On the contrary, representatives of Defendants made repeated false and misleading statements to representatives at all levels of Flextronics during discussions of Capacitors prices and the Capacitor industry generally.   Defendants repeatedly and consistently falsely identified non-collusive justifications for prices that were in fact set through collusion.

223.    As a global purchaser of Capacitors, Flextronics engaged in thousands of transactions with the Conspirators during the Conspiracy Period.   Members of the

Conspiracy, after being specifically asked to justify Capacitor pricing, repeatedly and consistently lied about the reasons prices were set at a particular level.

224.    Accordingly, Flextronics was not on inquiry notice of facts that would cause Flextronics to inquire about whether there was a conspiracy to artificially fix, raise, maintain or stabilize prices for aluminum, tantalum and film Capacitors and respective output.

225.    A 2006 email from a SANYO employee expressed Defendants' intent to keep their collusive actions secret and how the cartel's members intended to do so: "[E]xchanging information is useful . . . . However, it maybe [*sic*] become a double-edged sword at times. To the extent possible, try to exchange verbally so that no evidence is left behind. Especially pricing figures and important presentation materials."

226.    The Conspirators'  records regarding their secretive cartel meetings exist in the form of emails, summaries and notes taken or drafted by The Conspirators' employees in attendance at these meetings. These emails, summaries and notes recounting these meetings and The Conspirators'  unlawful agreements were only circulated among a limited number of their fellow employees who were responsible at their respective companies for implementing the cartel's anticompetitive actions.  When circulated, these emails, summaries and notes regularly included instructions from their authors to distribute them internally with the utmost sensitivity due to the competitively sensitive information contained within them.

227.    For example, a SANYO employee who regularly took notes at the meetings he attended on this company's behalf circulated these notes via email among

SANYO employees and leadership responsible for implementing the cartel's anticompetitive actions by giving the recipients introductory admonitions to take "the utmost care in handling [these] report[s]" because the "gathering[s] [*i.e.*, the cartel's meetings] should not be disclosed to the public."

228.     Similarly, in other communications exchanged internally among SANYO employees coordinating pricing with NEC-TOKIN employees, email recipients were instructed "Once you read this email, please delete it."

229.     Within the Conspirators'  secretive communications, they frequently attempted to conceal details of their collusive discussions and agreements by using coded language to identify the cartel members and their respective employees involved in discussions and agreements made in furtherance of the conspiracy.

230.     With regard to aluminum and film Capacitors, the Conspirators often attributed price changes and increased production lead times to difficulties procuring the necessary raw materials to manufacture their products.

231.     For example, in 2010, Nichicon, Nippon Chemi-Con and Panasonic each made a number of public statements to industry and technology media in which they attributed supply limitations and price quote adjustments to shortages of aluminum foil and increasing costs for other raw materials required for manufacturing.

232.     With regard to tantalum Capacitors, the Conspirators often attributed price changes and increased production lead times to difficulties procuring the necessary tantalum to manufacture their products.

233.     For example, in 2010 and 2011, Vishay and Panasonic each made a number of public statements to industry and technology media attributing supply

58

limitations and pricing adjustments for their tantalum electrolytic Capacitors to raw materials supply issues.

234. More specifically, from 2011 to 2013, Conspirators Hitachi Chemical, Nippon Chemi-Con, Nichicon, Rubycon and ELNA attributed their production delays to the lasting effects of the 2011 Tohoku earthquake and tsunami in eastern Japan.

235. Further, in 2011, Defendants NEC TOKIN and ROHM attributed production delays to flooding in Thailand.

236. The Conspirators' misleading statements were designed to conceal their conspiracy and lull Flextronics into believing that the price changes and extended production lead times were the normal result of competitive and economic market forces, rather than the product of collusive, unlawful efforts.

237. As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Flextronics has as a result of the anticompetitive and unlawful conduct alleged herein.

## VII. EFFECTS OF DEFENDANTS' CONSPIRACY

238. Defendants' combination and conspiracy as set forth herein has had the following effects, among others:

a. The conspiracy restrained price competition among Defendants in the sale of their respective electrolytic and film Capacitors during the Conspiracy Period to Flextronics;

b. The conspiracy increased the price of electrolytic and film Capacitors sold by Defendants during the Conspiracy Period to Flextronics above levels that would have obtained in competitive conditions; and

59

c.     The conspiracy deprived Flextronics of the benefit of free and open competition in the market for electrolytic and film Capacitors.

239.     As a direct and proximate result of Defendants' anticompetitive and unlawful conduct, Flextronics has been injured in its business and property in that it paid artificially inflated prices for the electrolytic and film Capacitors it purchased directly and indirectly from Defendants.

240.     Flextronics has been damaged as measured by the full amount of the overcharges that it paid for Capacitors purchased directly and indirectly from Defendants in an amount subject to proof and to be determined at trial.

**FIRST CLAIM FOR RELIEF (Alleged against all Defendants)**

**RESTRAINT OF TRADE IN VIOLATION OF THE SHERMAN ACT § 1**

**15 U.S.C. § 1**

241.     Flextronics hereby repeats and incorporates by reference each proceeding and succeeding paragraph as though fully set forth herein.

242.     This claim is pleaded as to all Defendants.

243.     Beginning some time before but no later than January 1, 2003, the exact date being unknown to Flextronics and exclusively within the knowledge of Defendants, Defendants entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition for the pricing of aluminum, tantalum and film Capacitors directly sold to United States purchasers.

FLEXTRONICS INTERNATIONAL USA, INC.'S COMPLAINT

244.   In particular, Defendants have combined and conspired to raise, fix, maintain or stabilize the prices of electrostatic and film Capacitors sold to Flextronics during the Conspiracy Period.

245.   Additionally, Defendants and their Co-Conspirators have combined and conspired to set artificial and unjustified production lead times to limit available supply of electrolytic and film Capacitors sold to United States purchasers during the Conspiracy Period.

246.   As a result of Defendants' and their Co-Conspirators' unlawful conduct and acts taken in furtherance of their conspiracy, prices for electrolytic and film Capacitors sold to Flextronics during the Conspiracy Period were raised, fixed, maintained or stabilized at artificially inflated levels.

247.   The combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their Co-Conspirators.

248.   For purposes of formulating and effectuating their combination or conspiracy, Defendants and their Co-Conspirators did those things they combined or conspired to do, including:

a.   Participating in meetings and conversations to discuss their respective prices and supply of electrolytic and film Capacitors and how they could effectively coordinate their actions to restrain trade for these products;

b.   Communicating in writing and orally to raise, fix, maintain or stabilize prices for electrolytic and film Capacitors, and to quote artificial and unjustified production lead times to limit available supply of these Capacitors;

61

c. Agreeing to coordinate and manipulate the prices and available supply of these Capacitors directly and indirectly sold to Flextronics in a manner that deprived Flextronics of free and open price competition;

d. Issuing or signaling to each other price announcements, price quotations and production lead times for specific aluminum, tantalum and film Capacitors in accordance with the agreements Defendants and their Co-Conspirators reached among themselves;

e. Selling electrolytic and film Capacitors to Flextronics at anti-competitive and artificial prices that Defendants and their Co-Conspirators collusively determined; and

f. Providing pretextual justifications to Flextronics to explain any raises, maintenance, or stabilization of the prices for Defendants' electrolytic and film Capacitors.

249.   Defendants' anticompetitive and unlawful conduct was illegal *per se*.

250.   As a result of Defendants' anticompetitive and unlawful conduct, Flextronics has been injured in its businesses and property in that it has paid more for the electrolytic and film Capacitors that Flextronics purchased during the Conspiracy Period than it otherwise would have paid in the absence of Defendants' conduct.

**SECOND CLAIM FOR RELIEF (Alleged against all Defendants)**

**VIOLATION OF STATE ANTITRUST AND UNFAIR COMPETITION LAW**

**(Bus. & Prof. Code, sections 16720 *et seq*. and section 17200 *et seq*.)**

251.   Flextronics hereby repeats and incorporates by reference each proceeding and succeeding paragraph as though fully set forth herein.

252. This claim is pleaded as to all Defendants.

253. By reason of the foregoing, Defendants and their Co-Conspirators have entered into an agreement in restraint of trade in violation of California's Cartwright Act, California Business and Professions Code sections 16720, *et seq.* and California's Unfair Competition Law (Bus. & Prof. Code section 17200 *et seq.*).

254. Beginning at a time at least as early as January 1, 2003, and continuing thereafter through the present, Defendants and their Co-Conspirators entered into and engaged in a continuing violation of Section 16720, California Business and Professions Code. Defendants, and each of them, have acted in violation of section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for electrolytic and film Capacitors at supra-competitive levels.

255. In particular, Defendants have combined and conspired to raise, fix, maintain or stabilize the prices of electrolytic and film Capacitors sold in the United States.

256. As a result of Defendants' unlawful conduct, prices for electrolytic and film Capacitors were raised, fixed, maintained, and stabilized in the United States.

257. The contract, combination or conspiracy among the Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their Co-Conspirators.

258. For purposes of formulating and effectuating their contract, combination, or conspiracy, Defendants and their Co-Conspirators did those things they contracted, combined or conspired to do, including:

a. Participating in meetings and conversations to discuss the prices and supply of electrolytic and film Capacitors.

b. Communicating in writing and orally to fix prices of electrolytic and film Capacitors.

c. Agreeing to manipulate prices and supply of electrolytic and film Capacitors sold in the United States in a manner that deprived Flextronics of free and open competition.

d. Issuing price announcements and price quotations in accordance with agreements reached.

e. Selling electrolytic and film Capacitors to customers in the United States at non-competitive prices.

f. Providing false statements to the public to explain increased prices for electrolytic and film Capacitors.

259. As a direct and proximate result of Defendants' unlawful conduct, Flextronics has been injured in its business and property in that it paid more for electrolytic and film Capacitors than it otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Flextronics seeks treble damages and its costs of suit, including a reasonable attorney's fee, pursuant to section 16750(a) of the California Business and Professions Code.

260. It is appropriate to apply California antitrust law to Flextronics's purchases of electrolytic and film Capacitors. During the Conspiracy Period, Flextronics purchased Capacitors at artificially inflated prices in California, and, as a result, is

64

entitled to the protection of the laws of California. In addition, conspiratorial acts occurred in California, and the Conspirators targeted their price-fixing activities at large purchasers of electrolytic and film Capacitors and/or electronic products containing electrolytic and film Capacitors in California, such as Flextronics, Apple, Inc., Intel Corp., and Hewlett Packard Co.

261.    The majority of Defendants maintained sales and marketing arms in the United States to conduct business with major customers. These defendants are incorporated, located, and headquartered in the United States, and each does substantial business in domestic interstate commerce throughout the United States. For example, Nippon Chemi-Con maintained offices in Lansing, North Carolina and Buena Park, California to be responsible for manufacturing and selling Capacitors.

262.    Based on the foregoing, the foreign-based defendants have no reasonable expectation as to the application of different state laws. Suppliers selling to Flextronics reasonably expect that California law governs the transaction. For example, Flextronics has contracts with two defendants, Nippon Chemi-con and EPCOS AG; both are expressly governed by California law.

263.    By reason of the foregoing, Defendants and their Co-Conspirators have also engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code section 17200, *et seq.*

264.    Defendants and their Co-Conspirators committed acts of unfair competition, as defined by section 17200 *et seq.*, by engaging in a conspiracy to fix and stabilize the price of Capacitors as described above.

265.    Defendants' and their Co-Conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of Section 17200, *et seq.*, including, but not limited to, (1) violation of Section I of the Sherman Act; and (2) violation of the Cartwright Act.

266.    Defendants' and their Co-Conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independent of whether they constitute a violation of the Sherman Act or the Cartwright Act.

267.    Defendants' and their Co-Conspirators' acts or practices are fraudulent and deceptive within the meaning of Section 17200, *et seq.*

268.    Defendants' and their Co-Conspirators' conduct was carried out, effectuated and perfected within the state of California.  Defendants committed acts in furtherance of the conspiracy by selling Capacitors to Flextronics at prices negotiated in California, and also by selling Capacitors intended for sale to California consumers and Flextronics customers in California.

269.    During the Conspiracy Period, Flextronics purchased price-fixed Capacitors in California, and is therefore entitled to the protection of the laws of California.

270.    By reason of the foregoing, Flextronics is entitled to full restitution and/or disgorgement of all revenues, earning, profits, compensation, and benefits that may have

been obtained by Defendants or their Co-Conspirators as a result of such business acts and practices.

## DEMAND FOR JUDGMENT

**WHEREFORE,** Plaintiff requests that the Court enter judgment on behalf of Plaintiff Flextronics International USA, Inc., by adjudging and decreeing:

A.      That Defendants have combined and conspired in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and California's Cartwright Act, California Business and Professions Code sections 16720, *et seq.*, and 17200, *et seq.*, and that Flextronics has been injured in its business and property as a result of Defendants' violations;

B.      That Flextronics recover damages sustained by it, as provided by the federal and state antitrust laws under which relief is sought herein, and that a joint and several judgment in favor of Flextronics be entered against Defendants in an amount subject to proof at trial, which is to be trebled in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15; that Flextronics recover damages under California's Cartwright Act, and treble damages and its costs of suit, including reasonable attorneys' fees, pursuant to section 16750(a) of the California Business and Professions Code;  and that Flextronics recover damages pursuant to section 17200 of California's Business & Professions Code.

C.      That Flextronics be awarded any penalties, punitive or exemplary damages, and/or full consideration, where state law so permits;

D.      That Flextronics recover damages and/or all other available monetary and equitable remedies under applicable state unfair competition laws;

67

E.      That Flextronics is entitled to pre-judgment and post-judgment interest on the damages awarded, and that such interest be awarded at the highest legal rate from and after the date this complaint is first served on Defendants;

F.      That Flextronics is entitled to recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

G.      That Flextronics is entitled to receive such other or further relief as may be just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Flextronics demands a trial by jury of all the claims asserted in this complaint so triable.

68

Dated:  June 5, 2015                          FLEXTRONICS INTERNATIONAL USA, INC.


                                              By: /s/ Lesley E Weaver
                                                  Lesley E. Weaver
                                                  **Block & Leviton LLP**
                                                  (State Bar No. 191305)
                                                  492 9th Street, Suite 260
                                                  Oakland, CA 94607
                                                  Telephone:  (415) 968-8999
                                                  Facsimile:  (617) 507-6020
                                                  lweaver@blockesq.com

                                              *Pro Hac Vice* applications to be submitted for:

                                                  Charles E. Tompkins
                                                  Jordan D. Shea
                                                  **Williams Montgomery & John Ltd.**
                                                  233 S. Wacker Drive, Suite 6100
                                                  Chicago, Illinois 60606
                                                  Telephone:  (312) 443-3200
                                                  Facsimile:  (312) 630-8500
                                                  CET@willmont.com
                                                  JDS@willmont.com
                                                  *Lead Counsel*

                                                  *Counsel for Flextronics International USA, Inc.*

                                                  Tim Collins
                                                  **Collins & Scanlon LLP**
                                                  3300 Terminal Tower
                                                  50 Public Square
                                                  Cleveland, OH 44113
                                                  Telephone:  (216) 696-0022
                                                  Facsimile:  (216) 696-1166
                                                  Tcollins@collins-scanlon.com
                                                  *Of Counsel*

69